ALSTON & BIRD LLP
90 Park Avenue
New York, New York 10016
(212) 210-9400
Craig Carpenito
Alexander S. Lorenzo
-and-
John E. Stephenson, Jr., Of Counsel
One Atlantic Center
1201 West Peachtree Street
Atlanta, Georgia 30309
Tel: (404) 881-7000

*Attorneys for Paul Gardi and
Alex Interactive Media, LLC*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------X

IN RE:  DREIER LLP

                       Debtor.

Chapter 11

Case No. 08-15051 (SMB)

-----------------------------------------------------------------X

IN RE:  MARC S. DREIER

                       Debtor.

Chapter 7

Case No. 09-10371 (SMB)

-----------------------------------------------------------------X

PAUL GARDI and ALEX INTERACTIVE MEDIA, LLC
                       Appellants

Case No. 10-CV-04758 (DAB)

v.

SHELIA M. GOWAN, *as Chapter 11 Trustee for Dreier
LLP*

                       Appellee.

-----------------------------------------------------------------X

## APPELLANTS PAUL GARDI AND ALEX INTERACTIVE MEDIA, LLC'S BRIEF IN SUPPORT OF APPEAL FROM BANKRUPTCY COURT ORDER DENYING THE MOTION FOR AN ORDER GRANTING RELIEF FROM THE AUTOMATIC STAY

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................iii

PRELIMINARY STATEMENT ............................................................................1

BASIS OF APPELLATE JURISDICTION...........................................................3

ISSUES PRESENTED AND STANDARD OF REVIEW ....................................3

STATEMENT OF CASE .......................................................................................4

I.   NATURE OF THE CASE AND PROCEDURAL AND BACKGROUND
     FACTS RELEVANT TO THE ISSUES PRESENTED............................................4

     A.  Procedural Background....................................................................4

         *The Gardi Parties' Motion to Lift Stay* ...........................................4

         *Judge Stuart M. Bernstein's April 28 Memorandum Decision*............................5

         *The Gardi Parties' Notice of Appeal* .................................................6

     B.  Factual Background ..........................................................................6

         *The Compensation Dispute with JANA* ..............................................6

         *Dreier Steals the Settlement Funds JANA Intended for the Gardi Parties*..........6

ARGUMENT...........................................................................................................9

I.   THE BACKRUPTCY COURT ERRED AS A MATTER OF LAW IN
     DENYING THE GARDI PARTIES' MOTION TO LIFT STAY .........................9

     A.  The Bankruptcy Court Erred as a Matter of Law in Ruling that the Dreier
         LLP Estate is the Rightful Owner of the Stolen Settlement Funds.....................9

     B.  The Bankruptcy Court Erred as a Matter of Law in Finding that the Tracing
         of the Stolen Settlement Funds for the Benefit of the Gardi Parties was
         Impermissible..................................................................................13

         i.   The Stolen Settlement Funds are Readily Identifiable ....................14

C.  The Bankruptcy Court Erred in Finding that the Gardi Parties Were Not Entitled to Impose a Constructive Trust on the Stolen Settlement Funds ...........15

D.  The Gardi Parties are Not Similarly Situated to Other Victims and therefore a Pro Rata Distribution Scheme is Inapplicable to the Gardi Parties ..................18

E.  Because the Stolen Settlement Funds Are Not Assets of the Dreier LLP Estate, the Automatic Stay Does Not Apply to Actions Seeking the Recovery of These Funds.....................................................................................21

CONCLUSION.................................................................................................................22

## TABLE OF AUTHORITIES

**Cases**                                                                                                                    **Page(s)**

*470 West End Corp., v. East River Savings Bank,*
102 Misc. 2d 1024, 424 N.Y.S.2d 859 (N.Y. Civ. Ct. N.Y. County 1980) ..........................11, 17

*Bank of India v. Weg & Myers, P.C.,*
257 A.D.2d 183, 691 N.Y.S.2d 439 (1st Dep't 1999) ..........................................................15

*Butner v. United States,*
440 U.S. 48 (1978).......................................................................................................9, 17

*DeWeerth v. Baldinger,*
836 F.2d 103 (2d Cir. 1987)...................................................................................11, 17-18

*In re Amy,*
263 F. 8 (2d Cir. 1920)....................................................................................................10

*In re Caramania Corp. N.V.*
154 B.R. 160 (S.D.N.Y. 1993)............................................................................................9

*In re Iorizzo,*
114 B.R. 19 (Bankr. E.D.N.Y. 1990)................................................................................10

*In re Luthra,*
182 B.R. 88 (E.D.N.Y. 1995) ...........................................................................................4

*In re Minton Group, Inc.,*
46 B.R. 222 (S.D.N.Y. 1985)...........................................................................................20

*In re Mishkin,*
138 B.R. 410 (Bankr. S.D.N.Y. 1992)..............................................................................20

*In re Newpower,*
233 F.3d 922 (6th Cir. 2000) .....................................................................................11, 12

*In re Pavlovsky,*
No. 05-18225 (SMB), 2006 WL 2987870 (Bankr. S.D.N.Y. Oct. 13, 2006).......................10, 21

*In re Schick*
246 B.R. 41 (Bankr. S.D.N.Y. 2000).......................................................................10, 12, 15

*In re Third Eighty-Ninth Associates,*
138 B.R. 144 (S.D.N.Y. 1992)...........................................................................................4

**Cases** <span style="float:right">**Page(s)**</span>

*In re Vienna Park Properties*
136 B.R. 43 (S.D.N.Y. 1992), *aff'd*, 976 F.2d 106 (2d Cir. 1992) ........................................9

*Jasco Tools, Inc. v. Dana Corp. (In re Dana Corp.),*
574 F.3d 129 (2d Cir. 2009) ...........................................................................................4

*Republic of Haiti v. Duvalier,*
211 A.D.2d 379, 626 N.Y.S.2d 472 (1st Dep't 1995) ............................................15

*SEC v. Byers,*
637 F. Supp. 2d 166 (S.D.N.Y. 2009) ...........................................................................20

*SEC v. Credit Bancorp, Ltd.,*
290 F.3d 80 (2d Cir. 2002) .....................................................................................19, 20

*SEC v. Universal Express, Inc.,*
No. 04 Civ. 2322 (GEL), 2008 WL 1944803 (S.D.N.Y. Apr. 30, 2008) ..............17

*Solomon R. Guggenheim Foundation v. Lubell,*
77 N.Y.2d 311, 567 N.Y.S.2d 623 (1991) ...........................................................11, 18

**Rules and Statutes**

11 U.S.C. § 158(a) ....................................................................................................3

11 U.S.C. § 362(a) ..................................................................................................1, 10

11 U.S.C. § 362(a)(2) ...............................................................................................21

11 U.S.C. § 362(a)(3) ...............................................................................................21

11 U.S.C. § 362(a)(4) ...............................................................................................21

11 U.S.C. § 362(a)(5) ...............................................................................................21

11 U.S.C. § 541 ....................................................................................................10, 12

11 U.S.C. § 541(b)(1) ...............................................................................................17

11 U.S.C. § 541(d) ...................................................................................................17

11 U.S.C. § 547(b) ...................................................................................................12

**Rules and Statutes**                                                                 **Page(s)**

Fed. R. Civ. P. 4001 .................................................................................................1

**Other Authorities**

Collier on Bankruptcy P. 362.03 (2009) ................................................................20

Paul Gardi ("Gardi") and Alex Interactive Media, LLC ("AIM") (collectively, the "Gardi Parties" or "Appellants"), by and through their attorneys, Alston & Bird LLP, respectfully submit this Brief on Appeal, seeking reversal of an Order entered by the Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") (Hon. Stuart M. Bernstein) on May 12, 2010 in *In re Dreier LLP,* No. 10-CV-04758 (the "Dreier LLP Bankruptcy"), to the extent that the May 12 Order denies the Gardi Parties' Motion for an Order Granting Relief from the Automatic Stay, pursuant to 11 U.S.C. § 362(a) and Fed. R. Bankr. P. 4001 (the "Motion to Lift Stay").

## PRELIMINARY STATEMENT

This action arises from the (now) notorious criminal misconduct of former high-profile attorney, Marc Dreier ("Dreier"). In October 2008, Dreier was representing the Gardi Parties in a contentious dispute over compensation owed to the Gardi Parties pursuant to a business relationship with a large hedge fund when he stole a $6.3 million "settlement payment" intended for the Gardi Parties. Specifically, Dreier orchestrated a fraudulent settlement with the hedge fund, JANA Partners LLC ("JANA"), and then immediately converted to his own use the resulting $6.3 million settlement payment that was intended for the Gardi Parties. (DN 11-346 at ¶¶ 4-11.)[1] As set out in further detail below, Dreier's theft of the $6.3 million (the "Stolen Settlement Funds")[2] is no different than if Dreier had robbed a courier service on its way to

---

[1] For the sake of simplicity, all contents of the record cited to herein are referenced by their assigned docket numbers (DN) in the respective bankruptcy proceeding. Documents from the Chapter 11 docket are designated by the prefix "DN 11-XXX", while documents from the Chapter 7 docket are designated by the prefix "DN 7-XXX".

[2] Although it is clear that no valid settlement could result from Dreier's fraudulent activity because the Gardi Parties did not agree to the settlement terms Dreier communicated to JANA and the Gardi Parties have not ratified the fraudulent settlement agreement, for the purposes of this appeal the Gardi Parties will refer to the $6.3 million at issue as the Stolen Settlement Funds.

deliver the Stolen Settlement Funds to Gardi's office—in both situations the criminal conduct effectuates the transfer of neither legal nor equitable title to the stolen funds.

The Gardi Parties first learned of Dreier's theft at the time of his arrest in Canada and since then have tirelessly sought to recover the Stolen Settlement Funds. Based on the limited Dreier LLP financial information received by the Gardi Parties to date, it is apparent that within two days of the theft of the Stolen Settlement Funds, Dreier fraudulently conveyed the majority of the Stolen Settlement Funds to certain third-parties. Each of these transactions is discrete and traceable. Because Dreier and Dreier LLP did not—and could not—obtain legal or equitable title to the Stolen Settlement Funds by virtue of Dreier's theft, these fraudulent conveyances were void *ab initio* and, under New York law, the Gardi Parties are entitled to recover the Stolen Settlement Funds that were transferred to these third-parties.

The transfers of the Stolen Settlement Funds to third-parties occurred within ninety days of the commencement of the Dreier LLP Bankruptcy, which raised the issue of whether these transfers were preferential transfers under bankruptcy law and thus could be the subject of an avoidance action brought by the Dreier LLP Bankruptcy Estate. Accordingly, the Gardi Parties moved to lift the automatic stay in that proceeding, arguing that the Dreier LLP Estate had neither legal nor equitable title to the funds and therefore lacked standing to pursue avoidance actions or enter into compromise and settlement agreements regarding the Stolen Settlement Funds. The Gardi Parties further argued that even if Dreier and/ or his law firm, Dreier LLP (collectively, the "Dreier Parties") had legal title to the funds, because the Dreier Parties indisputably had no equitable title to the funds, the Gardi Parties were entitled to pursue their claims for the Stolen Settlement Funds against the third-parties to whom the Dreier Parties transferred the funds. This motion was denied by the Bankruptcy Court, which held that despite

the fact that the Dreier Parties had only legal title to the Stolen Settlement Funds, by virtue of the bankruptcy filing the Dreier LLP Estate could somehow acquire from the third-party transferees something Dreier and Dreier LLP never had: *equitable* title to the Stolen Settlement Funds. (*See* DN 11-520 at 37.)

This outcome is contrary to the well settled law in this District. Under the binding precedent of this Judicial District, creditors are precluded from receiving through the filing of a bankruptcy petition superior title to property than the bankrupt debtor possessed on the date of the bankruptcy filing. In other words, the law does not allow the creditors of a debtor-thief to legitimize the ill-gotten gains of the debtor's criminal conduct and thereafter invoke the preference powers of the bankruptcy court to deprive the victims of the debtor's criminal conduct from their legal interest in the stolen property. The Bankruptcy Court's denial of the Gardi Parties' motion to lift stay results in precisely this windfall for the creditors of the Dreier LLP Estate. Accordingly, the Gardi Parties respectfully request that this Court reverse the Bankruptcy Court's denial of the Gardi Parties motion to lift the automatic stay and permit the Gardi Parties to pursue the Stolen Settlement Funds into the hands of third party transferees, who could not receive from the debtor-thief greater title to the Stolen Settlement Funds than the thief possessed at the time of the fraudulent transfer.

## BASIS OF APPELLATE JURISDICTION

This Court has jurisdiction pursuant to 28 U.S.C. §§ 158(a) and 1134(a). The Bankruptcy Court's order is a final, appealable order.

## ISSUES PRESENTED AND STANDARD OF REVIEW

This appeal presents the following issues: (1) Whether the Bankruptcy Court erred as a matter of law in denying the Gardi Parties' Motion to Lift Stay; (2) Whether the Bankruptcy

Court erred as a matter of law in ruling that the Dreier LLP Estate is the rightful owner of the

Stolen Settlement Funds; (3) Whether the Bankruptcy Court erred as a matter of law in finding

that the tracing of the Stolen Settlement Funds for the benefit of the Gardi Parties was

impermissible; (4) Whether the Bankruptcy Court erred as a matter of law in finding that the

Gardi Parties were not entitled to impose a constructive trust on the Stolen Settlement Funds; and

(5) Whether the Bankruptcy Court erred as a matter of law in ruling that a *pro rata* distribution

scheme is applicable to the Gardi Parties.

On appeal to a District Court, the Bankruptcy Court's legal conclusions are reviewed *de

novo*. *Jasco Tools, Inc. v. Dana Corp. (In re Dana Corp.)*, 574 F.3d 129, 144-45 (2d Cir. 2009);

*In re Third Eighty-Ninth Associates*, 138 B.R. 144, 146 (S.D.N.Y. 1992); *In re Luthra*, 182 B.R.

88, 91 (E.D.N.Y. 1995) ("Where the bankruptcy court has determined whether particular conduct

satisfies a legal standard, the conclusion may be reviewed *de novo* by the district court.").

## STATEMENT OF THE CASE

I.   **NATURE OF THE CASE AND PROCEDURAL AND BACKGROUND FACTS
     RELEVANT TO THE ISSUES PRESENTED**

   A.   **Procedural Background**

*The Gardi Parties' Motion to Lift Stay*

On December 22, 2009, the trustee for the Dreier LLP Bankruptcy (the "Dreier LLP

Trustee") entered into a settlement agreement with the trustee for Dreier's individual bankruptcy,

*In re Marc S. Dreier,* No. 09-10371 (the "Dreier Individual Bankruptcy") (the "Dreier Individual

Trustee," and collectively with the Dreier LLP Trustee, the "Trustees"), and GSO Capital

Partners LP ("GSO"), its affiliates and all entities controlled or managed by GSO or one of its

affiliates (collectively, the "GSO Parties" and with the Trustees, the "Settling Parties") (the

"Original GSO Settlement"), which the Trustees moved this Court to approve on January 8, 2010. (DN 11-337, DN 11-338.)

On January 15, 2010, the Gardi Parties filed a Motion for an Order Granting Relief from the Automatic Stay, pursuant to 11 U.S.C. § 362(a) and Fed. R. Bankr. P. 4001 in the Dreier LLP Bankruptcy. (DN 11-344, DN 11-345, DN 11-346.)

On February 2, 2010, the Bankruptcy Court heard both the Gardi Parties' Motion to Lift Stay and the Settling Parties' Original GSO Settlement motion. (DN 11-376.)

*Judge Stuart M. Bernstein's April 28 Memorandum Decision*

On April 28, 2010, the Bankruptcy Court issued a memorandum decision that addressed both the Settling Parties' Original GSO Settlement motion and the Gardi Parties' Motion to Lift Stay (the "April 28 Decision"). (DN 11-520.) The April 28 Decision denied the Original GSO Settlement Motion with instructions to the Settling Parties to propose a new settlement more narrowly tailored and in accordance with its decision. (DN 11-520 at 42.) In confirmation of the April 28 Decision, on May 12, 2010, Judge Stuart M. Bernstein entered an Order (the "May 12 Order") denying the Gardi Parties' Motion to Lift Stay. (DN 11-553.)

On May 6, 2010, the Settling Parties submitted a renewed settlement agreement proposal (the "Renewed Settlement Motion"). (DN 11-540, DN 11-541.) Judge Bernstein entered an Order on June 9, 2010 (the "June 9 Order"), which approved the Renewed Settlement Motion.[3] Both the May 12 Order and June 9 Order relate to the same issues addressed in the April 28 Decision.

---

[3] The June 9 Order is not included in the Record on Appeal because Appellants designated the Contents of the Record on Appeal on May 26, 2010.

*The Gardi Parties' Notice of Appeal*

On May 12, 2010, the Gardi Parties timely filed a Notice of Appeal of the May 12 Order, to the extent that the Order denied the Gardi Parties' Motion to Lift Stay. (DN 11-556.)[4]

### B.   Factual Background

*The Compensation Dispute with JANA*

In or about July 2008, the Gardi Parties retained the law firm of Dreier LLP to represent them in connection with the resolution of a compensation dispute between the Gardi Parties and JANA (the "Compensation Dispute"). (DN 11-346 at ¶2.) The Dreier LLP lawyer responsible for this matter was Dreier. (DN 11-346 at ¶3.)

In early October 2008, Gardi learned that JANA had agreed to the financial component of a potential settlement, which required JANA to pay $6,349,093.00 to the Gardi Parties. (DN 11-346 at ¶4.) Notwithstanding the agreement in principal regarding the basic economics of a potential settlement, there remained a number of material terms that had to be agreed upon before a settlement could be finalized. (DN 11-346 at ¶4.)

*Dreier Steals the Settlement Funds JANA Intended for the Gardi Parties*

In furtherance of Dreier's fraudulent scheme to steal the settlement payment JANA intended for the Gardi Parties, Dreier falsely represented to JANA that the Gardi Parties were willing to concede their position on all of the outstanding disputed terms and settle the dispute with JANA entirely on JANA's conditions. (DN 11-346 at ¶5.)

At the same time, Dreier falsely represented to Gardi that JANA was willing to concede its position and settle those same remaining disputed provisions on Gardi's terms. (DN 11-346

---

[4] In addition to the Notice of Appeal that the Gardi Parties filed to the May 12 Order, the Gardi Parties have also filed a Notice of Appeal of the June 9 Order that Judge Bernstein entered. Both the June 9 Order and the May 12 Order implement rulings issued in the April 28 Decision.

at ¶6.)  Dreier then forwarded Gardi a copy of the settlement agreement reflecting the fact that JANA had accepted Gardi's final demands.  (DN 11-346 at ¶7.)

As a result, Gardi signed the agreement both in his individual capacity and on AIM's behalf as its managing member (the "Gardi Parties' Agreement"), believing that the dispute had been settled on his terms and that the $6.3 million Gardi was owed by JANA would be paid directly to him (and not to Dreier) pursuant to his express instructions.  (DN 11-346 at ¶7.)

When the settlement funds did not arrive in the Gardi Parties' account, Gardi contacted Dreier several times over the next few weeks seeking an update regarding the timing for JANA's payment and also provided appropriate wiring instructions for payment directly to the Gardi Parties' bank accounts.  (DN 11-346 at ¶8.)  Each time, Gardi was assured that payment was imminent, but given a different reason for the delay.  (DN 11-346 at ¶8.)  Eventually, Dreier told Gardi that JANA was refusing to pay the funds until the Gardi Parties reached a settlement with another third-party in a related but separate dispute.  (DN 11-346 at ¶8.)

Unbeknownst to Gardi, during this same timeframe, Dreier forged Gardi's signature and a notarization on an entirely different "settlement agreement," which Gardi had neither seen nor authorized and which contained all of JANA's terms (the "Unauthorized Agreement").  (DN 11-346 at ¶9.)

Although the Unauthorized Agreement contained certain materially different terms than the version of the agreement Dreier had provided to Gardi, it did require that the $6,349,093.00 in settlement funds to be paid by JANA be delivered at the direction of the Gardi Parties.  (DN 11-346 at ¶10.)

On or about October 14, 2008, without Gardi's knowledge, consent or authorization, Dreier apparently requested that JANA wire the $6,349,093.00 in settlement funds intended

solely for the benefit of the Gardi Parties to a trust account at JP Morgan Chase Bank controlled

by Dreier and bearing Account Number xxx-xxx-xx5-966 (the "5966 Account").  (DN 11-346 at

¶11.)  Dreier indicated that the 5966 Account was an "Attorney Trust Account" and that the Wire

Amount should be sent "F/B/O Gardi."  (DN 11-346 at ¶11.)

On or about October 15, 2008, again without Gardi's knowledge, consent or

authorization, JANA transmitted the $6,349,093.00 to the 5966 Account (the "Wire Amount").

(DN 11-346 at ¶12.)

The $6.3 million was never received by the Gardi Parties.  (DN 11-346 at ¶13.)  Instead,

it was stolen by Dreier and converted for his own illicit purposes.

The Gardi Parties did not learn of the Unauthorized Agreement or the transmittal of the

Wire Amount to the 5966 Account until after Dreier was arrested.  (DN 11-346 at ¶14.)  No

portion of the Wire Amount was ever transferred to the Gardi Parties by the Dreier Parties or

JANA.  (DN 11-346 at ¶13.)  Within two days after the receipt of the Wire Amount, Dreier

conveyed the Wire Amount (now the Stolen Settlement Funds) to a discrete number of

identifiable recipients, including 280 Funding I, an affiliate of GSO, and FCOF UL Investments,

LLC.  (DN 11-345, Exhibit A., DN 11-345, Exhibit B.)

At no time did the Gardi Parties authorize Dreier or Dreier LLP to settle its dispute with

JANA on the terms set forth in the Unauthorized Agreement or authorize Dreier or Dreier LLP to

take receipt of any funds, including specifically the Stolen Settlement Funds.  (DN 11-346 at

¶15.)  Similarly, the Gardi Parties did not consent to, and had no knowledge of, the Dreier or

Dreier LLP's transfer of the Stolen Settlement Funds to any third-parties.  (DN 11-346 at ¶15.)

## ARGUMENT

### I.   THE BANKRUPTCY COURT ERRED AS A MATTER OF LAW IN DENYING THE GARDI PARTIES' MOTION TO LIFT STAY

The basic federal rule in bankruptcy is that state law governs the substance of claims. *Butner v. United* States, 440 U.S. 48, 57 (1978).  A party's rights should not diminish or vanish due to the occurrence of a bankruptcy.  *In re Carmania Corp. N.V.*, 154 B.R. 160, 165 (S.D.N.Y. 1993).  Indeed, it is a well-established legal principal that no party – whether a debtor or a creditor – may benefit from "receiving a windfall merely by reason of the happenstance of bankruptcy." *Butner*, 440 U.S. at 55 (internal quotations and citation omitted); *In re Vienna Park Properties*, 136 B.R. 43, 55 (S.D.N.Y.), *aff'd*, 976 F.2d 106 (2d Cir. 1992) (same).  The Bankruptcy Court's May 12 Order clearly enhances Dreier LLP's rights, the estates' rights, and the rights of the estates' creditors in the Stolen Settlement Funds at the expense of the Gardi Parties and is thus inconsistent with the policy of the code to leave state law rights undisturbed and to prevent a windfall recovery.

### A.   The Bankruptcy Court Erred as a Matter of Law in Ruling that the Dreier LLP Estate is the Rightful Owner of the Stolen Settlement Funds.

The Bankruptcy Court's ultimate denial of the Gardi Parties' Motion to Lift Stay is predicated on the erroneous conclusion that the Stolen Settlement Funds are property of the Dreier or Dreier LLP Estates.  The Bankruptcy Court erred as a matter of law in ruling that the Stolen Settlement Funds were property of the Dreier LLP Estate.  (*See* DN 11-520 at 37.) Neither Dreier nor Dreier LLP ever held equitable title to the Stolen Settlement Funds.  The commencement of bankruptcy proceedings by Dreier and Dreier LLP cannot change that fact. Simply put, the law does not permit either the Dreier or the Dreier LLP Bankruptcy Estates to

receive via a preference action a property interest that the debtors of those estates never

possessed prior to the filing of the bankruptcy.

According to the Bankruptcy Code Chapter 11, a debtor's bankruptcy estate is defined as

"all legal or equitable interests of the debtor in property" as of the commencement of the

bankruptcy action. *See* 11 U.S.C. § 541. Assets that the debtor acquired by theft or conversion

are not included as part of the bankruptcy estate. *See In re Mishkin*, 138 B.R. 410, 412 (Bankr.

S.D.N.Y. 1992) (holding that stolen funds are not part of bankruptcy estate because debtors have

no legitimate title claim to the funds or proceeds); *In re Iorizzo*, 114 B.R. 19, 24 (Bankr.

E.D.N.Y. 1990) (noting that the law is "clearly established that property obtained by fraud is not

part of the bankrupt's estate," and that "[a]ny monies stolen from defendant in this manner are

certainly not part of the bankrupt's estate"); *In re Amy*, 263 F. 8, 10 (2d Cir. 1920) (noting that

stolen assets are not property of the bankruptcy estate, as it is not the role of the trustee to

distribute *stolen* property): *In re Schick*, 246 B.R. 41, 43-44 (Bankr. S.D.N.Y. 2000) (SMB)

(holding that assets the debtor acquired by conversion and held in law firm bank account were

subject to obligation to reconvey to original owner).[5] Thus, if a debtor steals assets from an

individual and thereafter files for bankruptcy, such assets are not to be included in his bankruptcy

estate because they were never the debtor's property.

The foregoing conclusion is in line with the underlying policy of the Bankruptcy Code to

prevent one party from receiving a windfall at the expense of another.  Under New York law, a

party wrongfully dispossessed of its property has a right to recover the same from the party

responsible for the initial dispossession and, in addition, from any subsequent transferee even if

---

[5] Moreover, the Bankruptcy code and New York law make clear that the automatic stay pursuant to 11 U.S.C. § 362(a) applies only to those assets which are part of the bankruptcy estate. *See In re Pavlovsky*, No. 05-18225 (SMB), 2006 WL 2987870, at *2 (Bankr. S.D.N.Y. Oct. 13, 2006) (granting relief from automatic stay with regard to property deemed not part of bankruptcy estate); 11 U.S.C. § 362(a).

the transferee obtained the property in good faith. *See Solomon R. Guggenheim Foundation v.*

*Lubell*, 77 N.Y.2d 311, 317, 567 N.Y.S.2d 623, 626 (1991) ("New York case law has long

protected the right of the owner whose property has been stolen to recover that property, even if

it is in the possession of a good-faith purchaser for value."); *DeWeerth v. Baldinger*, 836 F.2d

103, 106-107 (2d Cir. 1987) (stating that under New York law a bona fide purchaser of stolen art

can nonetheless be liable for conversion); *470 West End Corp., v. East River Savings Bank*, 102

Misc. 2d 1024, 1027-28, 424 N.Y.S.2d 859, 861 (N.Y. Civ. Ct. N.Y. County 1980) (holding that

an action for conversion will lie against one who, although initially in lawful possession, either

refuses the demand of the rightful owner for return of the goods, or who commits an overt and

positive act of conversion).  Inclusion of the Stolen Settlement Funds as a part of the Dreier LLP

Estate will allow the Dreier Estates' creditors to "cash in" on Drier's theft despite the fact that

the creditors would have had no legal right to keep the funds absent bankruptcy.  It is exactly this

sort of inequitable outcome that the Bankruptcy Code was intended to prevent. *See Butner*, 440

U.S. at 55 (finding that no party – whether a debtor or a creditor – may benefit form "receiving a

windfall merely by reason of the happenstance of bankruptcy") (internal quotations and citation

omitted).

The Gardi Parties' unique situation shares many similarities with *In re Newpower*, a case

decided by the Sixth Circuit Court of Appeals.  233 F.3d 922 (6th Cir. 2000).  The debtor in

*Newpower* embezzled money directly from a corporation and used the money for his personal

interests (he "bought a Corvette, a four-wheel drive pickup truck, and a power boat") as well as

to pay off business loans (he "spent tens of thousands of dollars in 'loan repayments' to customer

trust accounts for [the corporation's] real estate business"). *Id.* at 927.  At the commencement of

his bankruptcy, some of the property he stole was still held by him and some was in the hands of

third-parties. The court held that stolen or embezzled funds were not part of the bankruptcy estate or subject to the bankruptcy automatic stay, whether currently held by the debtor or in the hands of third-parties. *See* 233 F.3d at 930-31, 935. The court reasoned that because the original owner of the property (the corporation) never intended to give title to the debtor, the debtor never had any legal interest in such funds, and consequently, the bankruptcy estate also has no such interest. *Id.* at 930.

In reaching this conclusion, the court in *Newpower* noted that the key distinction between the facts in *Newpower* and the cases cited by the trustee in opposing the lifting of the stay was that in *Newpower*, the debtor was "a thief." *Id.* at 936. This distinction was critical because it meant that unlike in the typical bankruptcy case where the question was whether the debtor had committed some act that would cause the court to strip the debtor of equitable title, the *Newpower* debtor, as a thief, had no title to the disputed funds and thus the funds could not be part of the debtor's estate. *Id.*

Like the debtor in *Newpower,* the Debtors in this case are not the rightful owners of the Stolen Settlement Funds. At most, Dreier LLP had obtained legal title to the Stolen Settlement Funds. As noted by the court in *Newpower*, a debtor cannot pass to the bankruptcy estate more of an interest in or title to property than the debtor himself has. *See In re Newpower*, 233 F.3d at 928-31. *See also In re Schick*, 246 B.R. at 44 (stating that "[i]f the debtor holds only legal title to the property, that is all that vests in the estate" and that "[t]he equitable title or interest is neither 'property of the estate' under § 541 nor 'property of the debtor' under § 547(b)). This is also true in regard to Dreier's or Dreier LLP's transfer of the Stolen Settlement Funds to 280 Funding I (a GSO affiliate). Since Dreier and Dreier LLP had no equitable title to or interest in the Stolen

Settlement Funds at the time of the transfer, 280 Funding I as transferee did not and could not obtain equitable title in that transaction.

Therefore, the Bankruptcy Court's refusal to lift the stay strips equitable title to the Stolen Settlement Funds from their rightful owner, passes it to the Dreier Estates and some of its creditors, and effectively completes the deprivation of the Gardi Parties' rights with respect to the Stolen Settlement Funds that started with Dreier's theft. Such an outcome is legally impermissible and the Supreme Court's decision in *Butner* makes clear that the filing of bankruptcy cannot change that result: The Dreier LLP Estate cannot receive a windfall at the expense of the Gardi Parties.

**B.     The Bankruptcy Court Erred as a Matter of Law in Finding that the Tracing of the Stolen Settlement Funds for the Benefit of the Gardi Parties was Impermissible.**

In their Motion to Lift Stay, the Gardi Parties contended that because Dreier did not – and could not – obtain legal or equitable title to the Stolen Settlement Funds, those fraudulent conveyances were void *ab initio* and the Gardi Parties were entitled to recover the portion of the Stolen Settlement Funds transferred to third parties, such as GSO affiliates. (DN 11-345 at ¶ 2.) The Stolen Settlement Funds are readily traceable to such third parties, as outlined below. The Bankruptcy Court concluded that tracing was not permissible because (i) the Debtors engaged in a Ponzi scheme and (ii) other "similarly situated" creditors would be prejudiced if the Gardi Parties were allowed to trace the Stolen Settlement Funds into the hands of third parties. (DN 11-520 at 39-41.) The Court's conclusion was erroneous because the cases that the Bankruptcy Court relied upon[6] are inapplicable to the Gardi Parties, who are not "similarly situated" with

---

[6] The Bankruptcy Court's analysis of the case law it relied upon in holding that tracing was improper in the context of a Ponzi scheme (*See* DN 11-520 at 35.) overlaps with the Court's analysis of whether the Gardi Parties are similarly situated to other creditors of the Dreier and Dreier LLP Estates. Accordingly, these two topics are discussed together in Section D, *infra*.

other creditors, and because no prejudice would be caused by permitting the Gardi Parties to trace and recover the Stolen Settlement Funds.

The Bankruptcy Court erroneously concluded that the Gardi Parties' attempt to trace the Stolen Settlement Funds would cause prejudice to the creditors and the Dreier Estates, as it would grant them priority in payment.  (DN 11-520 at 41.)  Because the Stolen Settlement Funds are not, and never were, assets of the Dreier LLP Estate, the purported "priority" payment of those Funds would cause no prejudice to anyone.  The Dreier LLP Estate, and its creditors, would be in no worse position than if the Stolen Settlement Funds were paid, as intended, to the Gardi Parties in the first place.

> i.     **The Stolen Settlement Funds are Readily Identifiable.**

The Gardi Parties can readily identify the Stolen Settlement Funds.  As the 5966 Account records reveal, on October 14, 2008, the day before JANA transferred the $6,349,093.00 to the 5966 Account, the closing balance of the 5966 Account was $41,637.73.  (*See* DN 11-345, Exhibit A; *see also* DN 11-345, Exhibit B.)  By October 17, 2009, all of the Stolen Settlement Funds were transferred out of the account.  *See id.*

Applying the tracing assumption that the Stolen Settlement Funds in the 5966 Account were the first funds to leave the account ("FIFO"), approximately two million of the $6.3 million in Stolen Settlement Funds were transferred out of the 5966 Account on October 16, 2008.  *See id.*  The majority of this two million in Stolen Settlement Funds was transferred to Dreier LLP accounts where it was commingled with Dreier LLP funds.  *See id.*  However, there were two transactions that appear to be payments on Dreier's fraudulent notes.  The first transaction was a transfer to an account at Goldman Sachs & Co. in the amount of $137,500.00 that references an account at Perella Wienberg.  *See id.*  The second transaction was a transfer to LaSalle National

Bank in the amount of $10,815.80 that was directed to an account controlled by FCOF UL Investments, LLC with the reference "Solow Realty 6/08." *See id.*

The following day, October, 17, 2008, the remaining four million in Stolen Settlement Funds was transferred to an account at the Bank of New York controlled by 280 Funding I as part of a $6,555,250.00 transfer to 280 Funding I's account.[7] *See id.* The reference line in this transaction, which states "Kent Wong Solow Note March, 07," makes clear that this transfer was made as a payment on one of Dreier's fraudulent Solow notes. *See id.*

Because neither Dreier nor Dreier LLP had either equitable or legal title to the Stolen Settlement Funds, Dreier LLP could not convey either legal or equitable title to the any of the third-parties to whom portions of the Stolen Settlement Funds were transferred.[8] *See In re Schick*, 246 B.R. at 43, 47. Accordingly, the Dreier LLP Estate has no right to these funds and the Gardi Parties are entitled to pursue their recovery of these amounts directly from the fraudulent transferees.

### C.     The Bankruptcy Court Erred in Finding that the Gardi Parties Were Not Entitled to Impose a Constructive Trust on the Stolen Settlement Funds.

The Gardi Parties argued in their Motion to Lift Stay that because the Stolen Settlement Funds were not part of the Dreier LLP Estate, to the extent any of the Stolen Settlement Funds were recovered (whether in a preference action against third-parties or via a settlement), they are held by the Estates in constructive trust for the benefit of the Gardi Parties. Contrary to the

---

[7] 280 Funding I is an affiliate of GSO Facilities. Under the terms of the June 9 Order, Gardi is precluded from pursuing claims for any portion of the $6.3 million in stolen settlement funds that could be traced to 280 Funding I. The Gardi Parties address this issue in their Notice of Appeal of the June 9 Order.

[8] Additionally, replevin is an available remedy for the conversion of money under New York case law so long as it is specifically identifiable. *See Republic of Haiti v. Duvalier*, 211 A.D.2d 379, 384, 626 N.Y.S.2d 472, 475 (1st Dep't 1995) (wrongfully obtained funds that could be traced back to a particular bank account were considered sufficiently identifiable to give rise to a claim for conversion); *Bank of India v. Weg & Myers, P.C.*, 257 A.D.2d 183, 191, 691 N.Y.S.2d 439, 445 (1st Dep't 1999) (proceeds from settlement agreement considered sufficiently identifiable to give rise to a claim for conversion).

Bankruptcy Court's premise that a constructive trust is "at odds with the principle of equal

distribution among creditors," a constructive trust of the Stolen Settlement Funds would not

disrupt distribution among other creditors because the Funds are not, and never were, owned by

the Debtors or the Dreier Estates.   (*See* DN 11-520 at 38) (internal citations omitted).   The

Bankruptcy Court's ruling on the constructive trust issue was erroneous because it presupposes

that the Gardi Parties stand in the same shoes as the creditors involved in the Ponzi scheme.  As

discussed in section D. below, the Gardi Parties are not Ponzi scheme victims and are not

similarly situated to other creditors of the Bankruptcy Estates.  (*See* DN 11-520 at 38.)  The

Bankruptcy Court held that the "imposition of a constructive trust grants a priority to the

beneficiary of the constructive trust, and is fundamentally at odds with the principal of equal

distribution," which assumes that the Gardi Parties are similarly situated to other creditors and

would be subject to such equal distribution.  To the contrary, the Gardi Parties are not

sophisticated hedge funds who participated in Dreier's Ponzi scheme by willingly purchasing

high yield real estate notes in arms-length commercial transactions in the hope of making

substantial returns.  Instead, the Gardi Parties were clients of Dreier LLP and were owed the

highest fiduciary duties of loyalty and good faith.  While acting as their trusted advisor, Dreier

committed a brazen theft of the Stolen Settlement Funds that were intended for the Gardi Parties.

These Stolen Settlement Funds were never intended for investment purposes, nor were they ever

knowingly or willingly placed at risk by the Gardi Parties.  Instead, these funds were converted

by Dreier to his own purpose in a theft that was wholly unrelated to the Note Fraud Scheme.

Because the Stolen Settlement Funds cannot be part of the Dreier LLP Estate, in the event

or to the extent that the Trustee recovers any such funds from third parties via settlement or in a

preference action, they are held by the Estate in constructive trust for the benefit of the Gardi

Parties. *See* 11 U.S.C. § 541(b)(1) ("Property of the estate does not include any power that the debtor may exercise solely for the benefit of an entity other than the debtor"), § 541(d) ("Property in which the debtor holds . . . only legal title and not an equitable interest" becomes property of the estate "only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.").[9]

The Bankruptcy Court rejected the Gardi Parties' claim to a constructive trust, in part, because it relied on the Trustees' claim that the GSO Parties did not act in bad faith in transferring the Stolen Settlement Funds.  (*See* DN 11-520 at 38.) ("The Trustees agreed to settle the fraudulent transfer claim, in part, because Gowan's investigation did not turn up any evidence of GSO's bad faith.").  Dreier fraudulently induced JANA to wire the Stolen Settlement Funds to Dreier LLP, and Dreier caused the Stolen Settlement Funds to be transferred to the GSO Parties.  Dreier is a thief at every transfer in the chain of title.  Contrary to the court's cited authority, *SEC v. Universal Express, Inc.*, No. 04 Civ. 2322, 2008 WL 1944803, at *3 (S.D.N.Y. Apr. 30, 2008) (GEL), there is significant authority indicating that even a transferee acting in good faith who obtains title to stolen property may still be liable to the true owner.  A party wrongfully dispossessed of his property has a right to recover it from any transferee even if the transferee obtained the property in good faith.  *See 470 West End Corp., v. East River Savings Bank*, 102 Misc. 2d 1024, 1027-28, 424 N.Y.S.2d 859, 861 (N.Y. Civ. Ct. N.Y. County 1980) (an action for conversion will lie against one who, although initially in lawful possession, refuses the demand of the rightful owner for return of the goods); *DeWeerth v. Baldinger*, 836 F.2d 103,

---

[9] Furthermore, it appears that the Bankruptcy Court concluded that a constructive trust was not permissible due to the heightened review constructive trust claims receive when raised in the context of a bankruptcy. *See* April 28 Decision, at 39. As set forth in *Butner*, a victim's rights under state law may not be diminished due to the occurrence of a bankruptcy. *See* 440 U.S. at 57. The Gardi Parties' right to a constructive trust is not abrogated merely because Dreier LLP and Marc S. Dreier filed for bankruptcy.

106-07 (2d Cir. 1987) (noting that a good faith purchaser can be liable for conversation and is considered a wrongdoer once it refuses the rightful owner's demand for return); *Solomon R. Guggenheim Foundation v. Lubell*, 77 N.Y.2d 311, 317, 567 N.Y.S.2d 623, 626 (1991) ("New York case law has long protected the right of the owner whose property has been stolen to recover that property, even if it is in the possession of a good-faith purchaser for value.") The issue of the GSO Parties' putative good faith is a red herring and inapposite to the Gardi Parties' legal right to pursue the Stolen Settlement Funds in their hands.

### D. The Gardi Parties are Not Similarly Situated to Other Victims and therefore a Pro Rata Distribution Scheme is Inapplicable to the Gardi Parties.

In its April 28 Decision, the Bankruptcy Court ultimately treated the Gardi Parties as if they were similarly situated to the note fraud victims of Dreier's Ponzi scheme. (DN 11-520 at 36, noting that while "[e]ach victim, investor or client, has its own unique story . . . all are victims of a 'unified scheme to defraud'.") The Bankruptcy Court opted to include the Gardi Parties in the same category as the note fraud victims because doing otherwise would be "unfair" and "would require a costly and expensive inquiry into each victim's loss." (DN 11-520 at 35, 36.) This conclusion was made in error, however, because the Gardi Parties are clearly not victims of Dreier or Dreier LLP's "unified scheme to defraud" that affected the note fraud investors. (*See id.*)

The great majority of claimants to the funds in the two related bankruptcy actions fall into two categories: business creditors of Dreier LLP and defrauded investors in Dreier's Ponzi scheme. The Gardi Parties do not fall into either of these categories.[10] Business creditors of

---

[10] Even Dreier concedes that the Gardi Parties are differently situated than note fraud investors. At an April 12, 2010 audioconference of the 341 Creditors Meeting at the Office of the United States Trustee, Dreier stated that "all of the money that was intended for Mr. Gardi. . . was intended to be paid" and that "the money I had in the 5966 account, a large part, was definitely intended to pay Mr. Gardi." Dreier noted that while he generally engaged in misconduct, clients such as the Gardi Parties were treated as

Dreier LLP allowed the law firm to incur debt to them as a result of arms length business transactions and accepted the risk, however seemingly slight, that the debt would not be repaid. Investors in Dreier's Ponzi scheme, in spite of the guarantees and initial fantastic returns that are typical of a well-run Ponzi scheme, accepted the risk of loss or lack of returns that is inherent in all business investments. The Gardi Parties, on the other hand, were clients of Dreier LLP. Dreier LLP was hired to perform legal services for the Gardi Parties in exchange for fees. The Gardi Parties correctly and sensibly did not anticipate that any funds recovered from JANA and held by Dreier LLP in trust would be at risk. In stark contrast to the two major groups of claimants, there was never any foreseeable risk of loss with respect to funds held in trust by the Gardi Parties' counsel, who owed the Gardi Parties fiduciary duties of the utmost loyalty and good faith.

The Bankruptcy Court primarily relies upon *SEC v. Credit Bancorp, Ltd.*, 290 F.3d 80 (2d Cir. 2002) for the proposition that the right of a Ponzi scheme victim to trace his investment is severely limited. (DN 11-520 at 35.) The facts involved in *Bancorp* are readily distinguishable from the Gardi Parties' situation and the case's holding is therefore inapplicable to the Gardi Parties. In *Bancorp*, the plaintiff transferred eight million shares of stock into the accounts of the individual conducting a Ponzi scheme. *See Bancorp*, 290 F.3d at 84. Although the shares were to remain under title of plaintiff, the shares were given over to the individual to serve as collateral for a credit facility. *Id.* The funds transferred were unquestionably intended as an investment. The Second Circuit ultimately applied a *pro rata* distribution method to all the

---

separate from the note fraud victims. He noted "I feel particularly badly that your client and a few other clients who thought they had money being held in escrow at that time have not recovered their money, it was never my intention nor did I believe that I actually ever did anything to remove that money from the escrow account that was being held for them." *See* Transcript of the Audioconference of 341 Creditors, dated April 12, 2010, at 66-72.

investors whose investments were lost in the Ponzi scheme. The Second Circuit's decision was predicated upon the fact that all victims receiving *pro rata* distribution were (i) victims of the Ponzi scheme and (ii) similarly situated in their relationship to the defrauder. *See* 290 F.3d at 89. The Court noted that "Courts have favored *pro rata* distribution of assets where, as here, the funds of the defrauded victims were commingled and *where victims were similarly situated with respect to their relationship to the defrauders.*" *Id.* (emphasis added). Moreover, the court placed particular emphasis on the fact that investors willingly transferred title of the subject property to the defrauder. *See Bancorp*, 290 F.3d at 84. Under New York law, victims of a debtor's outright theft are treated differently than other creditors because the debtor has no legitimate claim to the funds or proceeds of the funds in question. *See In re Mishkin*, 138 B.R. 410, 412 (Bankr. S.D.N.Y. 1992) (holding that stolen funds are not part of bankruptcy estate, debtors have no legitimate title claim to the funds or proceeds).

As amply demonstrated above, the Stolen Settlement Funds were never intended to be an "investment" and the Gardi Parties are not similarly situated to the note fraud investors with respect to their relationship to Dreier and Dreier LLP. The Stolen Settlement Funds did **not** fall victim to a "unified scheme to defraud," *SEC v. Byers*, 637 F. Supp. 2d 166, 181 (S.D.N.Y. 2009), as suggested by the Bankruptcy Court. (DN 11-520 at 36.) The Bankruptcy Court correctly identified that a "unified scheme" existed – the Ponzi scheme – but that scheme does not encompass Dreier's presentation of forged settlement agreements to Gardi and JANA. Dreier's theft of the funds JANA paid for the benefit of the Gardi Parties' was wholly separate and apart from the Ponzi scheme. *See supra*, n. 7 (in his testimony, Dreier also noted that "I guess various trustees or the government has treated that money [the Stolen Settlement Funds] . . . as money that did not belong to Mr. Gardi or these clients, but, as I emphasized to the US

Attorney and to everybody else, all of the money that was intended for Mr. Gardi and for those clients . . . was intended to be paid to those people"). The Gardi Parties may not be - as the Bankruptcy Court notes - the only client victim, but the Gardi Parties' claim as a result of this unrelated criminal act is straightforward and does not require a costly or expensive inquiry. Because the Gardi Parties are differently situated than the note fraud investors, a *pro rata* distribution is not appropriate.

> **E.     Because the Stolen Settlement Funds Are Not Assets of the Dreier LLP Estate, the Automatic Stay Does Not Apply to Actions Seeking the Recovery of These Funds.**

As set out above, the Stolen Settlement Funds do not belong to the Dreier LLP Estate, and the automatic stay does not apply to actions seeking the recovery of these funds.

In New York, an automatic stay applies only to property of the bankruptcy estate. *See In re Pavlovsky*, No. 05-18225 (SMB), 2006 WL 2987870, at *2 (Bankr. S.D.N.Y. Oct. 13, 2006); 3-362 Collier on Bankruptcy P. 362.03 (2009) (citing *In re Minton Group, Inc.*, 46 B.R. 222, 225 (S.D.N.Y. 1985)). Under the Bankruptcy Code, section 362(a) stays efforts to interfere with, obtain possession of, or enforce a lien against "property of the estate" or "property of the debtor." *See* 11 U.S.C. § 362(a)(2), (3), (4). *See also* 11 U.S.C. § 362(a)(5). If certain assets are found not to be property of the estate or debtor, New York courts have found it proper to render the automatic stay inapplicable with regard to such assets. *See In re Pavlovsky*, 2006 WL 2987870, at *2.

## CONCLUSION

For the foregoing reasons, Appellants Paul Gardi and Alex Interactive Media, LLC respectfully request that this Court reverse the Bankruptcy Court's Order entered on May 12, 2010, to the extent that it denied the Gardi Parties' Motion to Lift Stay.

Dated: New York, New York
July 12, 2010

ALSTON & BIRD LLP

Craig Carpenito
Alexander S. Lorenzo
90 Park Avenue
New York, New York 10016
Tel: (212) 210-9400

-and-

John E. Stephenson, Jr., Of Counsel
One Atlantic Center
1201 West Peachtree Street
Atlanta, Georgia 30309
Tel: (404) 881-7000

*Attorneys for Paul Gardi and
Alex Interactive Media, LLC*